IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 18-cv-01398-PAB-SKC

DALKITA, INC., d/b/a Dalkita Construction,

     Plaintiff,

v.

DISTILLING CRAFT, LLC, and
DEVIN MILLS,

     Defendants.

---

## ORDER

---

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [Docket No. 9] and Defendants' Verified Cross-Motion for Preliminary Injunction Against Dalkita, Inc. and Colleen Moore [Docket No. 19]. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND

Plaintiff Dalkita, Inc. ("Dalkita") filed this action on June 6, 2018 asserting the following claims for relief: (1) trademark infringement and false designation of origin under § 43(a) of the Lanham Act, 15, U.S.C. § 1125(a); (2) cybersquatting under § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); (3) deceptive trade practices under the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq.*; (4) trademark infringement under Colorado common law; (5) unfair competition under Colorado law; (6) intentional interference with contractual relations under Colorado law; and (7) misappropriation of trade secrets under the Colorado Uniform Trade Secrets Act, Colo.

Rev. Stat. § 7-74-102 *et seq*. Docket No. 1. On July 30, 2018, plaintiff moved for a preliminary injunction on its federal trademark infringement and cybersquatting claims. Docket No. 9.[1] On August 24, 2018, defendants filed a cross-motion for a preliminary injunction based on their counterclaims for trademark infringement under § 43(a) of the Lanham Act and unfair competition under Colorado law. Docket No. 19. The Court held an evidentiary hearing on both preliminary injunction motions on October 9, 2018. Docket No. 36.

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on the parties' filings and the evidence presented at the October 9, 2018 evidentiary hearing:

1. Dalkita is a full service architecture and construction firm based in Littleton, Colorado. Dalkita's primary focus is designing distilled spirits plants. Docket No. 1 at 2, ¶¶ 7-8. Colleen and Scott Moore are the co-owners of Dalkita.

2. In October 2016, Dalkita hired defendant Devin Mills as a part-time distillery engineer. When hired, Mr. Mills owned his own company, Devin Mills Consulting, which he had started in 2012. Mr. Mills' job duties at Dalkita included helping to design and build distilleries. He also engaged in limited marketing activities, such as talking with prospective clients and attending the American Distillery Institute ("ADI") conference. *See* Exhibit 9 at 3-4.

3. On April 18, 2017, Mr. Mills signed Dalkita's employment manual, which provides that "[i]ncidental and occasional personal use of company computers, phones,

---

[1]At the evidentiary hearing, plaintiff indicated that it was limiting its request for a preliminary injunction to the trademark infringement claim.

or electronic mail and voice mail systems is permitted, but information and messages stored in these systems will be treated no differently from other business-related information and messages."  Exhibit 1 at 14.  The first page of the manual states that "[t]he content of a manual does not constitute nor should it be construed as a promise of employment or as a contract between Dalkita Construction, Inc. dba Dalkita Architecture & Construction, and any of its employees."  *Id.*

4.  In January 2017, Mr. Mills began developing the idea for a podcast aimed at helping distillers "get better at their jobs."  No one at Dalkita instructed Mr. Mills to create a podcast or authorized him to develop the podcast during work hours.  Between January 2017 and March 2017, Mr. Mills independently registered the domain name distillingcraft.com, created a landing page for the website, hired an artist to design a "Distilling Craft" logo, and developed a basic structure for the podcast.  *See* Exhibits A, B, C.  The landing page of the distillingcraft.com website stated "Podcast Coming Soon – May 2017."  The website was publicly accessible, but only six people signed up to be notified of the podcast via the website before July 18, 2017.  Those individuals consisted of Mr. Mills, his wife, two of his wife's co-workers, Mr. Mills' friend Michelle, and one "random guy."  Mr. Mills does not know how many people saw the landing page of the distillingcraft.com website between the date of its initial publication and July 18, 2017.

5.  On April 1, 2017, Mr. Mills and the Moores flew to Baltimore, Maryland for the ADI conference.  Dalkita paid for Mr. Mills' trip to Baltimore.  Mr. Mills told the Moores about the podcast and distillingcraft.com during the flight to Baltimore.  Mr. Mills testified that he informed the Moores of the podcast at that time because he felt that it

would be unethical to solicit sponsors for the podcast at the conference without talking to Dalkita first. This testimony is corroborated by Ms. Moore's statement that Mr. Mills told her about the podcast in the "first quarter of 2017" and that the Moores informed Mr. Mills in April 2017 that they would reimburse him for any expenses associated with the podcast. Additionally, the first podcast-related entry in Mr. Mills' time records at Dalkita was on April 11, 2017. *See* Exhibit 9 at 4-5.

6. Mr. Mills testified that he told "probably a couple hundred people" at the ADI conference to visit the distillingcraft.com website and "check out what we were doing."

7. Mr. Mills testified that, after explaining his podcast idea to the Moores on the flight to Baltimore, he and the Moores entered into a sponsorship contract whereby Dalkita agreed to pay Mr. Mills his regular hourly rate for time spent on the podcast in exchange for Dalkita being the sole sponsor of the podcast. Mr. Mills testified that he initially asked Dalkita for $450-$500 per episode in exchange for sponsorship, but Mr. Moore suggested that Dalkita pay Mr. Mills on an hourly basis in order to avoid Dalkita having to fill out additional paperwork. Mr. Mills testified that producing one episode would require approximately ten hours of work. At the evidentiary hearing, the Moores denied the existence of any sponsorship agreement. Ms. Moore testified that Dalkita offered to pay for the costs of the podcast because the podcast belonged to Dalkita, not because of any sponsorship agreement. Likewise, Mr. Moore testified that there were no written or oral agreements concerning sponsorship.

8. The morning after the April 1, 2017 flight to Baltimore, Ms. Moore changed the colors of the Distilling Craft logo from red to orange to reflect Dalkita's branding. Mr. Mills testified that he agreed to the change.

4

9.   Mr. Mills' time records reflect that, beginning on April 11, 2017, Mr. Mills logged an average of ten hours of work for each podcast episode.  *See generally* Exhibit 9.  However, Mr. Mills' podcast-related time entries do not always reference the podcast specifically, *see, e.g.*, Exhibit 9 at 5 (April 21, 2017 time entry: "Emailed initial 4 desired interviewees then talked to James young and Sean smiley about when the scheduling would work best."), or give any indication that the time Mr. Mills spent on the podcast was governed by a separate sponsorship agreement.  *See generally* Exhibit 9.

10.   Ms. Moore was heavily involved in various aspects of the podcast's production, including the recruitment of guests, the development of questions for the interview segments, and marketing.  *See* Exhibits 10, 11.

11.   In July 2017, Dalkita hired a third-party audio editing firm to produce the finished audio files for the podcast.  *See* Exhibit 12.

12.   Updates on the podcast were incorporated into Dalkita's internal team meetings as early as May 2017.  *See* Exhibit 15.

13.   In certain emails with prospective podcast guests, some of which were copied to Mr. Mills, the Moores referred to the podcasts as Dalkita's podcasts.  *See, e.g.*, Exhibit 10 at 1 (January 9, 2018 email from Colleen Moore asking if distiller would "like to be on our podcast"), 6 (August 15, 2017 email from Colleen Moore asking if distillers would like to be guests on "our new podcast"), 12 (August 23, 2017 email from Colleen Moore to distiller Scott Hanson characterizing podcast as Dalkita's "little side project").  In other emails, Ms. Moore referred to Dalkita as a sponsor.  *See, e.g.*, Exhibit 10 at 3 (July 18, 2017 email from Colleen Moore stating that Dalkita was

"sponsoring/producing" the Distilling Craft podcast), 9 (August 23, 2017 email from Colleen Moore stating that Dalkita was "sponsoring a podcast hosted by Devin Mills").

14. There is no evidence that Mr. Mills attempted to correct the Moores when they told third parties that the podcast was "our podcast." Mr. Mills admits that he did not attempt to correct that impression or talk to Ms. Moore privately about it.

15. The first episode of the podcast was published on July 18, 2017. The podcast consists of three segments: (1) an engineering talk; (2) an interview; and (3) commercials.

16. Mr. Mills was the host of the podcast. He was responsible for conducting interviews, recording the "technical talk" portion of the show, and posting the updated metadata for the podcast to Blubrry. Blubrry is a podcast hosting platform. The final audio files from the podcast were uploaded onto the Blubrry platform where they were served out to other websites, such as iTunes, Google, and dalkita.com. Dalkita paid for the Blubrry account from the inception of the account until approximately one month after Mr. Mills' termination.

17. Dalkita paid for all expenses related to the podcast, except for the registration of the distillingcraft.com domain name. When Ms. Moore asked Mr. Mills to put the annual registration fee for the distillingcraft.com domain name on Dalkita's company credit card, Mr. Mills responded that he had already paid for the first year of the domain name on his own card, but would use the Dalkita card the following year. Exhibit 5.

18. The distillingcraft.com domain name remained under Mr. Mills' name. At some point, however, distillingcraft.com was redirected to Dalkita's website, where

Dalkita posted all of the information related to the podcast. *See* Exhibit 8.

19. Ms. Moore posted advertisements for the podcast on Facebook. Distilling Craft's Facebook page directed visitors to Dalkita's company website, dalkita.com. *See* Exhibit 6.

20. Between July 2017 and March 2018, Dalkita and Mr. Mills produced a total of twenty episodes of the Distilling Craft podcast. *See* Exhibit 9; Exhibit 12.

21. Mr. Mills' employment with Dalkita was terminated on March 12, 2018. Exhibit 9 at 54.

22. Before or immediately after Mr. Mills' termination, Mr. Mills changed the passwords to all the podcast-related accounts, including the Blubrry account. Approximately one month after his termination, Mr. Mills obtained formal ownership of the Blubrry account.

23. On March 15, 2018, Ms. Moore filed a Colorado trademark registration for the Distilling Craft mark. Exhibit H. The registration form lists a first use in commerce date of March 1, 2017. *Id.* at 2. Dalkita also has a pending trademark application with the U.S. Patent and Trademark Office.

24. Since Mr. Mills' termination, Dalkita has released "recut" episodes of the podcast that eliminate Mr. Mills' engineering segment. Mr. Mills has also released full episodes of the podcast.

25. Blubrry program statistics on the podcast show that total podcast downloads decreased from 4,283 in February 2018 to 919 in June 2018. *See* Exhibit I.

26. Sometime after Mr. Mills' termination, one of Dalkita's clients sent Dalkita an email response to an invoice from Mr. Mills for work performed by his consulting

business.

27.  Mr. Mills currently operates a consulting business called Devin Mills Consulting d/b/a Distilling Craft.

28.  Mr. Mills is scheduled to begin filming additional episodes of a television show related to distilling.  Mr. Mills hopes to promote the Distilling Craft brand via the show.

## III.  LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 US. 7, 20 (2008)); *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted).  Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule."  *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

**IV. ANALYSIS**

**A. Plaintiff's Entitlement to a Preliminary Injunction**

Plaintiff seeks a court order requiring defendants to (1) stop using the Distilling Craft mark as the name of their consulting business and podcast, and (2) return access and control of Dalkita's hosting accounts and the distillingcraft.com domain name to Dalkita pending the outcome of this litigation. Docket No. 9 at 15.

In determining whether plaintiff is entitled to a preliminary injunction, the Court begins by analyzing whether plaintiff has shown a likelihood of irreparable harm. *See First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (noting that, "because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered" (internal quotation marks omitted)). Because "[t]he purpose of a preliminary injunction is not to remedy past harm," *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005), the irreparable harm inquiry focuses on whether the plaintiff has demonstrated a "significant risk" that he or she will suffer irreparable injury before a court can render a final decision on the merits of the case. *See id.*; *Greater Yellowstone Coal.*, 321 F.3d at 1258. "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Plaintiff argues that it has shown irreparable harm because there is "a presumption of irreparable harm in trademark cases where a Plaintiff establishes

likelihood of success on the merits." Docket No. 9 at 12. In support of this

presumption, plaintiff cites *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656 (10th

Cir. 1987), where the Tenth Circuit recognized that "confusing similarity between . . .

trademarks" has been held to constitute "sufficient injury to warrant the issuance of a

preliminary injunction and that a movant who has established a likelihood of confusion

is 'not required to show that it lost sales or incurred other damage.'" *Id.* at 664 (internal

citations omitted) (quoting *GTE Corp. v. Williams*, 731 F.2d 676 (10th Cir. 1984)). As

plaintiff acknowledges, however, the U.S. Supreme Court in *eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388 (2006), called into doubt the continued validity of

a presumption of irreparable harm in intellectual property cases. In *eBay*, a patent

infringement lawsuit, the Supreme Court vacated the grant of a permanent injunction,

holding that neither the district court nor the court of appeals had fairly applied

traditional principles of equity in resolving the plaintiff's motion for injunctive relief. 547

U.S. at 393-94. The Supreme Court stated that traditional principles of equity require a

plaintiff to show four factors before a court may grant permanent injunctive relief:

> (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of hardships
> between the plaintiff and defendant, a remedy in equity is warranted; and
> (4) that the public interest would not be disserved by a permanent
> injunction.

*Id.* at 391. Rather than address these factors, however, the U.S. Court of Appeals for

the Federal Circuit had "articulated a 'general rule,' unique to patent disputes, 'that a

permanent injunction will issue once infringement and validity have been adjudged.'"

*Id.* at 393-94. The Supreme Court rejected the court's "categorical grant" of relief,

reasoning that "a major departure from the long tradition of equity practice should not be lightly implied" and that "[n]othing in the Patent Act indicates that Congress intended such a departure." *Id.* at 391-92 (internal quotation marks omitted).

Although the Tenth Circuit has not addressed whether *eBay* abrogates the presumption of irreparable harm applied in trademark infringement cases, *see Lorillard Tobacco Co. v. Engida*, 213 F. App'x 654, 657 (10th Cir. 2007) (unpublished) (declining to consider "how *eBay* may apply" in the trademark infringement context), the two circuits to consider the issue have concluded that the rationale of *eBay* does carry over to trademark cases. Relying on *eBay* and *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), the Ninth Circuit in *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013), held that a "plaintiff must establish irreparable harm" to obtain a "preliminary injunction in a trademark infringement case." *Id.* at 1249. In reaching that holding, the court determined that the principles announced in *eBay* apply equally to the trademark infringement context because, "[j]ust as '[n]othing in the Patent Act indicates that Congress intended [a departure from traditional equitable principles],' so too nothing in the Lanham Act indicates that Congress intended a departure for trademark infringement cases." *Id.* (quoting *eBay Inc.*, 547 U.S. at 391-92). The court further reasoned that the Supreme Court's holding in *Winter* – that a plaintiff must show a likelihood, rather than a mere possibility, of irreparable harm to obtain injunctive relief – reinforced a conclusion that courts may not presume irreparable harm when resolving preliminary injunction motions in trademark infringement cases. *Id.*

Applying reasoning similar to that of the Ninth Circuit, the Third Circuit in *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205 (3d Cir. 2014), held that *eBay*'s rationale applies to trademark infringement actions brought under the Lanham Act. *Id.* at 214. In doing so, the court rejected the plaintiff's argument that *eBay* should not be extended to the trademark context due to the differences between Lanham Act and patent claims. *Id.* at 215. The court reasoned that any differences were immaterial because "[t]he rationale of the *eBay* decision was not that patent cases are somehow unique, but rather . . . that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity." *Id.* (internal quotation marks omitted).

The Court finds the logic of these cases persuasive. Although plaintiff argues that the trademark context is fundamentally different from patents in that trademark law aims to protect the rights of consumers rather than private rights, the Court agrees with the Third Circuit that the Supreme Court's decision in *eBay* was not predicated on the unique nature of patent cases, but on the principle that courts may not depart from "the long tradition of equity practice" absent a clear congressional mandate to do so. *Id.* at 216 (quoting *eBay Inc.*, 547 U.S. at 391-92); *see also Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010) ("[N]othing in the text or the logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context."). As the Ninth Circuit reasoned in *Herb Reed*, the Lanham Act does not

indicate Congress intended that courts depart from traditional principles of equity in trademark cases. *See Herb Reed Enters.*, 736 F.3d at 1249. To the contrary, the Lanham Act's provision concerning injunctive relief states that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, *according to principles of equity* and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a) (emphasis added). The Court joins other courts in this district in finding that *eBay* abrogated the presumption of irreparable harm traditionally applied in trademark infringement cases. *See, e.g.*, *Found. Learning LLC v. Acad., Arts & Action Charter Acad.*, No. 17-cv-03182-RM-KLM, 2018 WL 3382933, at *2 (D. Colo. May 18, 2018) (finding, based on *eBay* and Tenth Circuit's recent decision in *First Western Capital Management Company*, a plaintiff "is required to show irreparable harm" to obtain preliminary injunctive relief in a trademark action); *Tony's Taps, LLC v. PS Enters., Inc.*, No. 08-cv-01119-MSK-KLM, 2012 WL 1059956, at *4-5 (D. Colo. Mar. 29, 2012) (noting that *eBay* "calls into doubt the reflexive imposition of a permanent injunction, simply because [trademark] infringement has occurred," and finding that "the better course of action is to avoid imposition of a prospective injunction based solely on 'presumptions' and instead to examine whether the circumstances of the case indicate a likelihood of future irreparable injury"); *Greenway Univ., Inc. v. Greenway of Ariz., L.L.C.*, No. 11-cv-01055-CMA-KLM, 2011 WL 2669174, at *6 (D. Colo. July 7, 2011) (citing *eBay* in support of court's decision not to apply a presumption of irreparable harm in a trademark lawsuit regardless of whether plaintiff had shown a likelihood of success on the merits); *see also JEG Powersports, LLC v. M & N*

*Dealership VI, LLC*, 2017 WL 3976296, at *3 (W.D. Okla. Sept. 8, 2017) (noting that the "general consensus among the courts that have addressed the issue is that the *eBay* analysis extends to trademark/tradename cases" and that, if those cases are correct, "plaintiff must do more than merely demonstrate that its tradename has been infringed to establish irreparable injury"); *cf. Red Robin Int'l, Inc. v. Lehigh Valley Restaurant Grp., Inc.*, No. 15-cv-02602-REB, 2016 WL 705988, at *4 n.3 (D. Colo. Feb. 23, 2016) (noting that "the presumption alone may not be sufficient to show irreparable harm" in light of the Supreme Court's decision in *eBay*).

Plaintiff argues that, even if there is no presumption of irreparable injury in trademark cases, it has presented "ample evidence that irreparable harm will result absent a preliminary injunction." Docket No. 9 at 12. At the evidentiary hearing, Mr. Moore testified that "[r]eputation is everything" when a company like Dalkita is providing a professional service. He expressed concern that defendants' continued use of the Distilling Craft trademark will cause customers to associate Dalkita with the services provided by Mr. Mills – services over which plaintiff no longer has any control – and that any accident attributable to Mr. Mills will therefore have a catastrophic and irreparable impact on plaintiff's reputation.

While plaintiff is correct that "[l]oss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context," *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 772 (9th Cir. 2015) (unpublished), plaintiff has not demonstrated that such harms are likely to result from defendants' continued use of the Distilling Craft trademark. For example,

plaintiff has presented no evidence that defendants' continued use of the mark is likely to erode plaintiff's customer base or that defendants are likely to provide inferior services in conjunction with the mark such that plaintiff would suffer injury to its reputation and loss of goodwill.[2]  As established at the evidentiary hearing, Mr. Mills has always been the host of the Distilling Craft podcast.  There is no reason to expect that the quality of the podcast will suddenly decline given that Mr. Mills' reputation would suffer as much as, if not more than, Dalkita's.  *See PGP, LLP v. TPII, LLC*, 734 F. App'x 330, 334 (6th Cir. 2018) (unpublished) (finding that, "although some trademark cases have found irreparable harm when the claimant risks losing control over the quality of goods that bear the claimant's marks," that danger was not present where the band performing under the contested mark was "composed of two of the three members that recorded [the original band's] hit record back in 2001" and plaintiff had "not pointed to any reason [to] expect the band's quality to suddenly decline while [the] litigation [was] pending").

Plaintiff contends that its loss of control over the trademark is sufficient to

_____

[2]As support for a finding that Mr. Mills' continued unauthorized use of the Distilling Craft trademark will result in irreparable harm to Dalkita, Scott and Colleen Moore stated in declarations submitted in conjunction with plaintiff's preliminary injunction motion that Mr. Mills "recently published a podcast episode called 'Ferment You,' an obvious play on a derogatory phrase which many in [the] industry will find untasteful."  Docket No. 9-1 at 4-5, ¶ 22; Docket No. 9-2 at 6-7, ¶ 33.  However, plaintiff has not presented any evidence that persons other than the Moores would interpret the title that way.  Nor have they shown that "many" people in the distilling industry would find such a play on words "untasteful."  Finally, there is no indication that Mr. Mills intends to publish podcasts with similar titles in the future.  *See Schrier*, 427 F.3d at 1267 (noting that "[t]he purpose of a preliminary injunction is not to remedy past harm").  Plaintiff's evidence is therefore insufficient to demonstrate a likelihood of reputational injury.

establish a likelihood of irreparable harm regardless of the quality of defendants'

services.  While plaintiff's position is not without support, *see, e.g.*, *U.S. Polo Ass'n, Inc.*

*v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011) (finding that,

regardless of the quality of defendants' product, plaintiffs' loss of control over their

reputation and goodwill was sufficient to demonstrate that plaintiffs would suffer

irreparable injury in the absence of a permanent injunction); *Women, Action & the*

*Media Corp. v. Women in the Arts & Media Coal., Inc.*, 2013 WL 3728414, at *10-11 (D.

Mass. July 12, 2013) (noting that "loss of control is a separate and distinct injury that

exists even if defendant's services are superior" and finding that plaintiff had

demonstrated a likelihood of irreparable harm by presenting "specific evidence that it

[was] currently losing control of its own mark because of defendant's similar branding"),

the Court cannot discern a meaningful distinction between allowing a plaintiff to satisfy

the irreparable harm requirement based solely on loss of control and applying a

presumption of irreparable harm any time there is finding of likely infringement.  *Cf.*

*Tony's Taps, LLC*, 2012 WL 1059956, at *4 (stating that the Supreme Court's

disapproval of "the reflexive imposition of a permanent injunction . . . simply because

infringement has occurred. . . . should apply equally to the presumption that because

there is a 'likelihood of confusion' between marks, that such confusion will result in

future irreparable harm").[3]  Indeed, there is a loss of control in every case where a

---

[3]As support for the proposition that "loss of control is a separate and distinct injury that exists even if defendant's services are superior," the court in *Women, Action & the Media Corp.* relied on § 24:15 of McCarthy on Trademarks & Unfair Competition, which states that "the overwhelming majority view is that it is not necessary for plaintiff to prove that the defendant's noncompeting goods are of inferior quality."  J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 24:15 (5th ed.).  However,

trademark is infringed.  To demonstrate a likelihood of irreparable injury, plaintiff must

do more than assert a loss of control over the Distilling Craft trademark.  Plaintiff must

establish that its loss of control is likely to have an adverse impact on its reputation or

customer base while this case is pending.  *See, e.g.*, *adidas America, Inc. v. Sketchers

USA, Inc.*, 890 F.3d 747, 759-60 (9th Cir. 2018) (holding that there was no support in

the record for a "finding of irreparable harm based on [plaintiff's] loss of control theory"

where plaintiff had not presented any evidence that the general public viewed the

competitor's shoe as a lower-quality brand such that confusion between the brands

would harm plaintiff's brand image); *Greenway Univ., Inc.*, 2011 WL 2669174, at *6

(finding no showing of irreparable injury where defendant had taken steps to reduce

customer confusion and plaintiff had not presented any evidence that it was losing

customers as a result of defendant's infringing conduct); *Technimed SRL v. Kidz-Med,

Inc.*, 763 F. Supp. 2d 395, 413 (S.D.N.Y. 2011) (finding that plaintiff had failed to

demonstrate a likelihood of irreparable injury based on loss of goodwill where "the

evidence concerning the products' relative quality [was] inconclusive"), *aff'd*, 462 F.

App'x 31 (2d Cir. 2012) (unpublished).  Because plaintiff has not made such a showing,

it has failed to demonstrate that it is entitled to a preliminary injunction.  As a result, the

Court need not consider the remaining requirements for preliminary injunctive relief.

_____

that section addresses the showing necessary for a finding of infringement, not a grant
of preliminary injunctive relief.  McCarthy's section on preliminary injunctions indicates
that the inferior quality of a defendant's infringing product or service is relevant to a
party's ability to establish irreparable harm in the absence of a presumption.  *See id.*,
§ 30:47.50 (noting that "irreparable harm can be demonstrated . . . . [i]f it is likely that
confused persons will mistakenly attribute to plaintiff defects or negative impressions
they have of defendant's goods or services").  Here, plaintiff fails to demonstrate that
defendants' podcasts are inferior.

*See First W. Capital Mgmt. Co.*, 874 F.3d at 1143 (finding that the court did not need to address the remaining preliminary injunction factors where the plaintiff could not show irreparable harm).

### B.  Defendants' Entitlement to a Preliminary Injunction[4]

The Court begins its analysis of defendants' motion for a preliminary injunction by considering whether defendants have shown a likelihood of success on the merits of their trademark infringement claim.[5]

To establish a claim for trademark infringement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), defendants must show that: (1) they have a protectable interest in the Distilling Craft mark; (2) plaintiff used an identical or similar mark "in connection with any goods or services"; and (3) plaintiff's "use is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or

---

[4]Plaintiff argues, as a threshold matter, that defendants seek a disfavored injunction and are therefore required to make a "strong showing" that the four preliminary injunction factors weigh in their favor.  Docket No. 28 at 11.  The Court need not resolve this issue.  As discussed below, defendants' motion fails even under a standard application of the preliminary injunction factors.

[5]Defendants also predicate their motion for a preliminary injunction on their claim for unfair competition under Colorado law.  However, because defendants limited their arguments to the trademark infringement claim at the evidentiary hearing, the Court will likewise limit its analysis to that claim.  Even if the Court were to consider both claims, however, defendants' unfair competition claim would fail for the same reason as their trademark infringement claim.  A claim for unfair competition under Colorado law requires defendants to show that (1) the Distilling Craft trade name has acquired a secondary meaning; and (2) plaintiff has unfairly used the name, or a simulation of it, against defendants.  *Gregg Homes, Inc. v. Gregg & Co. Builders, Inc.*, 978 P.2d 146, 147 (Colo. App. 1998).  As discussed below, defendants have not shown that they are likely to succeed in demonstrating ownership of the Distilling Craft mark.  Accordingly, their unfair competition claim fails on the second element.

approval of his or her goods, services, or commercial activities by another person."
*Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).

The parties' dispute centers on the first element – whether defendants have a protectable interest in the Distilling Craft mark. Defendants argue that Mr. Mills established ownership rights to the Distilling Craft mark before the publication of the first podcast episode on July 18, 2017 by (1) independently conceiving of and creating the mark, (2) designing the logo, (3) purchasing the DistillingCraft.com domain name, (4) creating a website, and (5) soliciting prospective viewers via the website. Docket No. 18 at 3, 7; Docket No. 19 at 10; Docket No. 30 at 3. Mr. Mills also testified at the evidentiary hearing that he told a "couple hundred" people at the April 2017 American Distillery Institute conference about distillingcraft.com.[6] Plaintiff counters that "[a]ny preparatory steps Mills took to launch the podcast in March of 2017" were insufficient to create trademark rights. Docket No. 24 at 3; Docket No. 28 at 5.

The general rule under federal trademark law is that "rights in trademarks are not gained through discovery or invention of [a] mark, but only through actual usage" of the mark in the provision of goods or services. McCarthy, *supra*, § 16:11; *see also Int'l Bancorp., LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 364 (4th Cir. 2003) ("Because a mark is used in commerce only if it accompanies services rendered in commerce, *i.e.*, it is employed appurtenant to an

---

[6]Defendants presented no evidence of any increase in the number of people visiting the website after the conference. The Court gives Mr. Mills' testimony on this point little weight.

established business or trade that is in commerce, mere advertising of that mark does not establish its protectability . . . ." (internal quotation marks omitted)); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."); *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1264-65 (5th Cir. 1975) ("Ownership of a mark requires a combination of both appropriation and use in trade. Thus, neither conception of the mark, nor advertising alone establishes trademark rights at common law." (internal citations omitted)). This rule is embodied in the text of the Lanham Act, which defines a mark as "any word, name, symbol, or device, or any combination thereof . . . (A) used by a person, or (B) which a person has a bona fide intention to use in commerce . . . to identify and distinguish his or her goods [or services]" from those offered by others. 15 U.S.C. § 1127.[7] A mark is "use[d] in commerce" when, with respect to goods, "(A) it is placed

---

[7]The Lanham Act distinguishes between trademarks, which pertain to goods, and "service marks," which pertain to services. *See id.* While the parties have not taken a clear position on whether the Distilling Craft mark constitutes a service mark or a trademark under the Lanham Act, the Court need not resolve this issue. Similar legal standards apply to both types of marks. *See Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (noting that "the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services," that "[s]ervice marks and trademarks are governed by identical standards, and that, "like with trademarks, common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered"); *see also Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839, 841 n.2 (5th Cir. 1990) (noting that, although "[t]here are differences between each classification with respect to registrability . . . under the Lanham Act," the terms "trademark," "service mark," and "trade name" are often used interchangeably"). *But*

in any manner on the goods or their containers or the displays associated therewith or

on the tags or labels affixed thereto, or if the nature of the goods makes such

placement impracticable, then on documents associated with the goods or their sale,

and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127. With

respect to services, a mark is used in commerce "when it is used or displayed in the

sale or advertising of services and the services are rendered in commerce, or the

services are rendered in more than one State or in the United States and a foreign

country and the person rendering the services is engaged in commerce in connection

with the services." *Id.*[8]

   Some courts, however, have held that trademark rights may "vest even before

---

*see Lloyds Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 768 (Fed. Cir. 1993) ("The legally significant use giving rise to rights in a mark for goods is derived from the placing of the mark in some manner on the goods either directly or on their containers or packaging. A service mark, on the other hand, entails use in conjunction with the offering and providing of a service. This makes all the more important the use of the mark in 'sales' or 'advertising' materials of different descriptions." (internal citation omitted)). For purposes of this order, the Court uses the terms "trademark" and "mark" to refer generally to marks used in conjunction with both goods and services.

   [8]There is no evidence that any party has obtained a federal registration. While plaintiff has presented evidence showing that Colleen Moore obtained state registration of the Distilling Craft mark, *see* Exhibit H, state trademark registration has no effect on the parties' Lanham Act claims. *See Pride Publishing Grp. Inc. v. Edwards*, 2008 WL 2201516, at *4 n.2 (E.D. Tenn. May 23, 2008) (noting that "state trademark registration ha[d] no direct effect" on a plaintiff's Lanham Act claims); *Jaguar Cars Ltd. v. Skandrani*, 771 F. Supp. 1178, 1185 (S.D. Fla. 1991) (finding that "Defendant's state trademark registration [was] not to be accorded any weight in [the court's] analysis since state trademark law and registration cannot override rights provided by federal law or federal registrations"). Nevertheless, "[t]he standards for determining whether a trade or service mark is eligible for protection are essentially the same under the common law and the Lanham Act." *Union Nat'l Bank of Texas, Laredo, Tex.*, 909 F.2d 839, 842 n. 6 (5th Cir. 1990). The only critical difference between registered and unregistered marks is that registered marks are afforded a presumption of validity. *Id.*

any goods or services are actually sold." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999) (citing *New W. Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)), *abrogated on other grounds by Herb Reed Enters., LLC*, 736 F.3d 1239; *see, e.g.*, *FN Herstal SA v. Clyde Armory, Inc.*, 838 F.3d 1071, 1081 (11th Cir. 2016) (stating that, "in the absence of actual sales, advertising, publicity, and solicitation" may be sufficient to establish prior use of a mark); *Chance*, 242 F.3d at 1158-59 (stating that "trademark rights can vest even before any goods or services are actually sold if the totality of one's prior actions, taken together, can establish a right to use the trademark" (internal quotation marks and brackets omitted)); *Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 986 F. Supp. 253, 259 (D. Del. 1997) (stating that advertising alone may be sufficient to establish "prior use and the resulting ownership of a trademark"); *Md. Stadium Auth. v. Becker*, 806 F. Supp. 1236, 1239 (D. Md. 1992) (stating that "advertising and promotion" may be "sufficient to obtain rights in [an unregistered] mark . . . as long as the totality of acts creates association of the goods or services and the mark with the user thereof" (internal citations, quotation marks, and brackets omitted)).  In such cases, the party seeking to establish ownership of a trademark has been required to show "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Brookfield*, 174 F.3d at 1052 (internal quotation marks and bracket omitted) (quoting *New W. Corp.*, 595 F.2d at 1200); *Blue Bell, Inc.*, 508 F.2d at 1266 (internal quotation marks omitted); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 371 (S.D.N.Y. 2007); *Lucent Info. Mgmt.,*

*Inc.*, 986 F. Supp. at 259.  Thus, to the extent that advertising alone may satisfy the commercial "use" requirement, it may do so only if the party's promotional activities are "of sufficient clarity and repetition to create the required identification" and have "reached a substantial portion of the public that might be expected to purchase the [good or] service."  *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 1377 (Fed. Cir. 1996).

The evidence presented by defendants fails to satisfy this standard.  Before the publication of the first podcast episode on July 18, 2017, Mr. Mills registered the distillingcraft.com domain name, set up the landing page for the website, and hired an artist to design a logo.  Mr. Mills testified that the website was publicly accessible on the internet before July 18, 2017.  The only evidence presented regarding the number of visitors to the site during that time period was Mr. Mills' testimony that a handful of family and friends and one "random guy" signed up to received the podcast.  This evidence does not support an inference that defendants' use of the mark had a "substantial impact" on the consuming public.  *T.A.B. Sys.*, 77 F.3d at 1376; *cf. Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992) (holding that "[a] few bottles sold over the counter . . . , and a few more mailed to friends . . . , neither link[ed] the . . . mark with [plaintiff's] product in the minds of consumers nor put other producers on notice"); *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) ("Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website, at such nominal expense, is the type of token and residual use of a mark that the Lanham Act does not consider a bona fide use in commerce."), *aff'd*, 747 F.3d 929 (7th Cir. 2014).  Although Mr. Mills testified that he spoke to a "couple

hundred people" at the ADI conference regarding distillingcraft.com, the Court, as noted above, gives this testimony little weight.  Thus, the Court is left with a handful of people that Mr. Mills said visited the site before July 2017.  Defendants have not shown, by a preponderance of the evidence, that Mr. Mills engaged in promotional efforts "sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind."  *Brookfield*, 174 F.3d at 1052 (internal quotation marks and bracket omitted).[9]

Defendants argue that, even if Mr. Mills' activities between January and July 2018 did not create rights in the Distilling Craft mark, Mr. Mills established ownership of the mark by "continuously us[ing], advertis[ing], and provid[ing] services under the Distilling Craft name with Plaintiff as the sponsor for approximately a year thereafter." Docket No. 30 at 5.  Defendants predicate their argument on the existence of a

---

[9]Even if the Court were to accord weight to Mr. Mills' testimony, the mere fact that he spoke to people at the ADI conference about distillingcraft.com does not demonstrate that "a substantial share of the consuming public [was] reached" or that "the consuming public came to identify" the mark with Mr. Mills' services.  *T.A.B. Sys.*, 77 F.3d at 1376-78 (finding that press releases, slide show presentations, brochures, and news articles were insufficient to establish analogous use trademark rights where the evidence presented did not support an inference that "a substantial share of the consuming public had been reached" or that "the consuming public came to identify" the mark with defendant's services); *see also Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 155 (S.D.N.Y. 2011) (finding that, despite plaintiff's assertion that it had "attended trade shows and gaming expeditions, created prototypes of products, purchased an 'email blast' announcing a 'Bling Bling' casino game to the gaming industry, disseminated press releases, and took out advertisements," the absence of any evidence regarding "how widespread these efforts were and how wide an audience they reached" precluded a finding that the "advertising and promotion was sufficiently 'open and notorious' to qualify as use in commerce" (internal citation omitted)); *Int'l Healthcare Exch., Inc.*, 470 F. Supp. 2d at 371-72 (finding promotional and advertising activities insufficient to demonstrate actual or analogous "use" of mark where plaintiff networked at monthly trade group meetings, was mentioned in one industry periodical, and sent numerous holiday cards to health care industry contacts).

sponsorship agreement.[10]  However, the parties' course of conduct is inconsistent with the existence of such an agreement.

The Court gives no weight to Dalkita's employment manual, which states that "[t]he content of a manual should [not] be construed . . . as a contract between Dalkita Construction, Inc. dba Dalkita Architecture & Construction, and any of its employees." Exhibit 1 at 1.  The following evidence, however, is inconsistent with the existence of a sponsorship agreement.  First, Ms. Moore was heavily involved in all aspects of the production process, including the recruitment of guests, the development of questions for the interview segments, and the marketing of the podcast.  *See* Exhibits 10, 11. That activity is inconsistent with Dalkita being merely a sponsor, but is consistent with Dalkita owning the podcast.  Second, Ms. Moore changed the colors of the Distilling Craft logo to match Dalkita's branding, and all information related to the podcast was

_____

[10]Defendants make no argument that any "use" of the podcast during the period in which Dalkita was involved in the production process should inure to the benefit of Mr. Mills in the absence of a sponsorship agreement.  *See* Docket No. 30 at 2 (stating that the "critical question in this case is whether Plaintiff agreed to act as a sponsor of the Distilling Craft Podcast or if, instead, Mills created the Distilling Craft Podcast as a work-for-hire for Plaintiff. . . . [I]f Mills created the Podcast as a work-for-hire for Plaintiff, then Plaintiff was the one using the Distilling Craft name and logo in commerce and is the owner of the trademark.").  Accordingly, the Court need not consider this issue.  The Court also does not address defendants' arguments regarding the "work for hire" doctrine.  That doctrine arises out of federal copyright law, *see Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) (citing federal copyright statute and stating that the Ninth Circuit "has summarized the work for hire doctrine as follows: When one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the *copyright* shall be in the person at whose instance and expense the work [was] done" (internal quotation marks, bracket, and ellipsis omitted) (emphasis added)), and defendants have not cited any cases applying it in the trademark context.

posted on Dalkita's website.  *See* Exhibit 8.  Although Mr. Mills agreed to Ms. Moore's idea of changing the colors, this is inconsistent with Dalkita simply being a sponsor.

Third, in emails with prospective podcast guests, Ms. Moore frequently characterized the podcast as belonging to Dalkita.  *See, e.g.*, Exhibit 10 at 1 (January 9, 2018 email from Colleen Moore asking if distiller would "like to be on our podcast"), 6 (August 15, 2017 email from Colleen Moore asking if distillers would like to be guests on "our new podcast"), 12 (August 23, 2017 email from Colleen Moore to distiller Scott Hanson characterizing podcast as Dalkita's "little side project").  While there are other emails in which Ms. Moore stated that Dalkita was "sponsoring" the podcast, those emails are ambiguous at best, referring also to "our show" and describing Mr. Mills as the "host" of the podcast rather than its creator/owner.  *See* Exhibit 10 at 3, 9.  Moreover, Mr. Mills' failure to correct the Moores' assertion of Dalkita's ownership role is, by itself, evidence that no sponsorship agreement existed.  Mr. Mills testified that he did not think it was necessary and it would have been "over the top" to do so, but his silence, combined with defendants' lack of any written evidence supporting the existence of a sponsorship agreement, weighs against any finding in favor of defendants on this issue.

Two additional facts are inconsistent with Mr. Mills' position.  First, there is no indication in Mr. Mills' time records that the hours he spent on the podcast were governed by a separate sponsorship agreement.  Second, the terms of the alleged sponsorship agreement are nebulous.  While Mr. Mills testified that Dalkita agreed to pay Mr. Mills his regular hourly rate for work performed on the podcast in exchange for sole sponsorship, defendants did not present any evidence regarding the parties' agreement on – or discussion of – other important issues suggesting a meeting of the

minds, such as the length of the sponsorship agreement, what expenses Dalkita would pay, how Mr. Mills would account for podcast-related work in his time sheets, and the extent to which Ms. Moore would be involved in the production process. In the absence of further evidence suggesting the existence of a sponsorship agreement, defendants fail to show that they are likely to succeed in demonstrating ownership of the Distilling Craft mark.

Because defendants have not shown a likelihood of success on the merits of their trademark infringement claim, they have failed to demonstrate a "clear and unequivocal" right to relief. *Beltronics USA, Inc.*, 562 F.3d at 1070. The Court will therefore deny defendants' request for a preliminary injunction without addressing the remaining preliminary injunction factors. *See Village of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (unpublished) (noting that party's "failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted"); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) (unpublished) (stating that "[a] party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor").

## V.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Preliminary Injunction [Docket No. 9] is **DENIED**. It is further

**ORDERED** that Defendants' Verified Cross-Motion for Preliminary Injunction Against Dalkita, Inc. and Colleen Moore [Docket No. 19] is **DENIED**.

27

DATED December 19, 2018.

BY THE COURT:

  s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge